AARON MICHAEL MORRISON (CA Bar # 228291)
LAW OFFICE OF AARON M. MORRISON
2000 Riverside Drive Los Angeles CA 90039
Tel. (213) 640-9129
Fax. (323) 662-2266
Email: aaronmorrisonlaw@gmail.com
*Attorney for the Petitioner*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PEDRO JUAN JIMENEZ.<br><br>Petitioner,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as acting United States Attorney General;<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security (DHS);<br><br>DAVID VENTURELLA, in his official capacity as Acting Director of Immigration & Customs Enforcement (ICE);<br><br>ERNESTO SANTACRUZ, JR., in his official capacity as Los Angeles Field Office Director of Immigration & Customs Enforcement; and<br><br>FERETI SEMAIA, in his official capacity as Facility Administrator, Adelanto ICE Processing Center,<br><br>Respondents. | Case No: 2:26-cv-12309<br><br>Agency Case No.: A 221-462-344<br><br>**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**<br><br>IMMIGRATION HABEAS CASE |

Petitioner, Mr. Pedro Juan Jimenez ("Mr. Jimenez") petitions this Court for a writ of habeas corpus to remedy his unlawful detention by Respondents, as follows:

INTRODUCTION

1. Mr. Jimenez is a forty-one-year-old male currently detained at the Adelanto ICE Processing Facility. The government has asserted that he is present in the United States without being admitted or paroled in violation of INA section 212(a)(6)(A). *See* Exhibits A, D, and I.

2. While in removal proceedings before the Adelanto Immigration Court, Mr. Jimenez through counsel, sought to have all evidence on the issue of alienage suppressed and his case terminated on the basis that his arrest by Immigration Customs and Enforcement ("ICE") violated his rights under the Fourth Amendment of the United States Constitution, as well as the government's own regulations. *See* Exhibit D. On August 12, 2026, an Immigration Judge ("IJ") issued a one-page order denying Mr. Jimenez's motion to suppress and terminate. *See* Exhibit F.

3. On August 18, 2026, the IJ conducted a bond hearing in Mr. Jimenez's pursuant to 8 U.S.C. § 1226(a). At the conclusion of the hearing, the IJ denied bond, finding that Mr. Jimenez had failed to establish that he is not a danger to the community or a flight risk. *See* Exhibit I.

4. Because, his detention is unlawful and not related to a statutory purpose, Mr. Jimenez is now submitting the instant petition for habeas corpus.

JURISDICTION

5. Petitioner, Mr. Jimenez is in the physical custody of Respondents and Immigration and Customs Enforcement, an agency within the Department of Homeland Security. Mr. Jimenez

is currently detained at the Adelanto ICE Processing facility in Adelanto, California and is under the direct control of the Respondents and their agents. *See* Exhibits A, B, D and I.

6. This action arises under the Constitution of the United States and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*

7. This Court has jurisdiction under 28 U.S.C. § 2241(c)(5) (habeas corpus), 28 U.S.C. § 1331 (federal question), and Article I, Section 9, clause two of the United States Constitution (the Suspension Clause).

8. This Court may grant relief pursuant to 28 U.S.C. § 2241, the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and the All Writs Act, 28 U.S.C. § 1651.

9. Nothing in the INA deprives this Court of jurisdiction, including 8 U.S.C. §§ 1252(b)(9), 1252(f)(1), or 1226(e). Congress has preserved judicial review of challenges to prolonged immigration detention. *See Jennings v. Rodriguez,* 138 S. Ct. 830, 839-41 (2018) (holding that 8 U.S.C. §§ 1226(e) and 1252(b)(9) do not bar review of judicial challenges to prolonged detention).

VENUE

10. Pursuant to *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 493-500 (1973), venue lies in the United States District Court for the Central District of California, the judicial district in which Mr. Jimenez is currently in custody.

11. Venue is also properly in this Court pursuant to 28 U.S.C. § 1391(e) because Respondents are employees, officers, and agencies of the United States, and because a substantial part of the events or omissions giving rise to the claims occurred in the Central District of California.

PARTIES

**Petitioner**

12. PEDRO JUAN JIMENEZ, Petitioner, is a current detainee at the Adelanto ICE Processing Facility. He has been in the custody of the Department of Homeland Security since May 13, 2026.

**Respondents (in their official capacities)**

13. TODD BLANCHE is the Attorney General of the United States and the head of the Department of Justice, which encompasses the Board of Immigration Appeals and immigration judges as a subunit under the heading the Executive Office of Immigration Review ("EOIR"). By virtue of his supervisory responsibility over EOIR, he is responsible for Petitioner's continued detention and place of detention.

14. MARKWAYNE MULLIN is the Secretary of the Department of Homeland Security ("DHS"), and is responsible for overseeing the Department, its sub-unit ICE, and has ultimate responsibility for the detention of non-citizen detainees in civil immigration custody. Secretary MULLIN is a legal custodian of Petitioner.

15. ERNESTO SANTACRUZ JR. is the Acting Field Office Director for the Los Angeles Field Office of ICE. Mr. Santacruz Jr. oversees ICE's custody determinations under that Field Office and is a legal custodian of Petitioner.

16. DAVID VENTURELLA, is the Acting Director of ICE and is named in his official capacity. As the head of ICE, an agency within the U.S. Department of Homeland Security that detains and removes certain noncitizens, Acting Director VENTURELLA is a legal custodian of Petitioner.

17. FERETI SEMAIA, is on information and belief employed by the private corporation Geo Group Inc., as facility administrator of the ICE Adelanto Processing Center,

where Petitioner is detained. He is the immediate physical custodian of Petitioner.

FACTUAL ALLEGATIONS

18. Petitioner, Mr. Jimenez is currently detained by Immigration and Customs Enforcement at the Adelanto ICE Processing Facility in Adelanto, California, where he has been incarcerated since May 13 2026. Prior to his detention, Mr. Jimenez resided at 66455 Dillon Rd, Space 2 Desert Hot Springs, California 92240. Mr. Jimenez has lived at this address with his girlfriend, and her daughter since June of 2022. Mr. Jimenez maintains: "I do not know anyone who resides at Space 39 of this address, and I have never set foot in that unit. Nor do I know anyone by name of 'Verdugo Terrazas." *See* Exhibit D.

19. On May 13, 2026, at approximately 8:00 a.m., Mr. Jimenez departed his home "at Space 2," in his truck (alone) for work. Soon thereafter, Mr. Jimenez noticed two vehicles behind him as he drove -- a red and white truck, in that order. Mr. Jimenez then noticed the white truck pass the red vehicle, to proceed directly behind him. "The white truck was not marked and did not signify in any way that it was connected to law enforcement. It was following so close behind me I thought it was trying to pass me. So, I moved out of the way and into the right lane. However, the white truck also changed lanes and continued to follow me." *See* Exhibit D. Petitioner then saw bright lights and heard a siren, signifying for him to pull over, which he did. Next, "three additional vehicles converged on the location where [he] was stopped, and approximately five or six masked, armed, individuals emerged from these vehicles and approached [his] vehicle. *Id.*

20. Upon seeing these masked individuals, Mr. Jimenez "was terrified and had no idea what was happening." *Id.* Mr. Jimenez states that he "panicked" and reached for his cell phone to call his girlfriend. Then one of the masked individuals screamed at him: "Turn off the vehicle! Don't call anyone! Don't text anyone!" *Id.* Mr. Jimenez complied with his demand, turned off

his vehicle and put his cell phone down. *Id.* Next, one of the masked men approached Mr. Jimenez's window on the passenger side. Mr. Jimenez states: "He did not tell me who he was or why he had stopped me. He screamed 'Give me your ID!' which I produced. He opened the car door on his own without my authorization and placed his right foot on the inside of my vehicle while he spoke to me, so as to prevent me from trying to flee my truck." *See* Exhibit D. While Mr. Jimenez was speaking with the officer on the driver's side, another masked officer was standing on the other side of the vehicle at the passenger window, screaming at Mr. Jimenez "at the top of his lungs: "Get out of the car! Get out of the car! Give me your ID! Any weapons in there?!" *Id.* Mr. Jimenez contends that this masked officer "was also striking the passenger window with some type of object, as he screamed at [him]. [Mr. Jimenez] could not tell what he was using to strike the window." *See* Exhibit D. Mr. Jimenez asserts:

> It was very confusing, disorienting and scary, to try and converse with the masked person at my window while the other masked person was screaming at me from the passenger side. The masked officer at my window side then asked if I had any "other ID," and I said "no." The same masked officer at my widow grabbed me by my left arm and physically removed me from my car. At no point did they give me the opportunity to exit my truck voluntarily, the officer simply reached in, grabbed me and forcibly removed me from my vehicle. Two officers then handcuffed me and asked, "where are you from?" They kept asking if I had any "other ID.

*Id.*

21. After handcuffing him, two masked officers searched and patted Mr. Jimenez down. They confiscated his wallet, car keys and cell phone. Mr. Jimenez asserts that he "did not in any way resist throughout this encounter and cooperated at all times." *Id.* The officers then walked Mr. Jimenez over to one of their vehicles and placed him inside in the backseat. Two masked officers then drove Mr. Jimenez to a nearby parking lot, where he was escorted out of the vehicle, and subsequently transferred to a van parked in this lot. *See id.* As Mr. Jimenez boarded the van, he could see that there were several other people handcuffed and inside the van, people who had also been arrested that morning. One officer drove the van and another sat with

us in the passenger section of the van. Mr. Jimenez states: "As we proceeded to drive, I noticed that the seat belts in the van did not work. This was terrifying because we were all handcuffed, and we were advised that we were going to San Bernardino 'to be processed.'" *Id.* He further states:

> I kept asking the officer about the seat belts and reminding him that we were handcuffed and how dangerous this was. Other people were complaining as well, but we were told that there was nothing that could be done. The ride from Desert Hot Springs to San Bernardino was about an hour and it was incredibly scary, having to remain handcuffed in a van with no working seat belts.

*See* Exhibit D.

22. Mr. Jimenez eventually arrived with the others at the San Bernardino office to be processed. As they exited the van, an officer asked Mr. Jimenez and the others for "our names, date of birth and where we were from." *Id.* They were then transferred inside the facility to a room Mr. Jimenez later learned was called the "cold room," because the temperature was "freezing" inside. *Id.* Mr. Jimenez states: "There were about 20-30 of us in the 'cold room.' We were forced to remain here until it was our turn to speak to an officer. The room was clearly filled beyond capacity and many of us had to sit or lay down on the floor because there was no more seating available." *Id.* After several hours, Mr. Jimenez was eventually called to be interviewed. An officer asked his name, date of birth and where he was from again. They asked him to sign some documents which he was not permitted to read or review. The officer also took his fingerprints. "Then, they transferred me back to the cold room, where I spent the night. It was an agonizing experience having to spend the night in the 'cold room.' I was forced to sleep on the cold floor. I could hear doors slamming loudly, and people yelling all night. It was a horrible and terrible experience." *Id.* The next morning, Mr. Jimenez was transferred to the Adelanto ICE Processing Facility, where he remains detained. *Id.*

23. On May 14, 2026, the government issued a Notice to Appear charging at Mr.

Jimenez is removable pursuant to INA section 212(a)(6)(A) in that he is an alien present without admission or parole. At a master calendar hearing, Mr. Jimenez through counsel, denied the allegations contained in the NTA, as well as the charge of removability. On July 31, 2026, Mr. Jimenez through counsel filed a motion to suppress asserting that his arrest by ICE violated the Fourth Amendment. The motion also asserted regulatory violations. On August 10, 2026, the government filed a response in opposition to the motion. *See* Exhibit E. On August 12, 2026, the IJ issued on sentence decision denying the motion to suppress: "Court adopts the rationale as expounded in their reply brief." *See* Exhibit F.

24. On August 18, 2026, the IJ conducted a bond hearing in Mr. Jimenez's case pursuant to 8 U.S.C. § 1226(a). At the conclusion of the hearing, the IJ denied bond to Mr. Jimenez, finding him to be a danger to the community and a flight risk. *See* Exhibit I. Mr. Jimenez has appealed that decision to the Board of Immigration Appeals. *See* Exhibit J. The appeal remains pending.

## LEGAL FRAMEWORK

25. Pursuant to 28 U.S.C. § 2243, the Court either must grant the instant petition for writ of habeas corpus or issue an order to show cause to Respondents, unless Petitioner is not entitled to relief. If the Court issues an order to show cause, Respondents must file a response "within *three days* unless for good cause additional time, *not exceeding twenty days*, is allowed." 28 U.S.C. § 2243 (emphasis added).

26. "It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "Freedom from imprisonment—from government

custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

27. This fundamental due process protection applies to all noncitizens, including both removable and inadmissible noncitizens. *See id.* at 721 (Kennedy, J., dissenting) ("[B]oth removable and inadmissible [noncitizens] are entitled to be free from detention that is arbitrary or capricious."). It also protects noncitizens who have been ordered removed from the United States and who face continuing detention. *Id.* at 690.

28. Thus, "[w]hile the temporary detention of non-citizens may sometimes be justified by concerns about public safety or flight risk, the government's discretion to incarcerate non-citizens is always constrained by the requirements of due process . . . ." *Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017).

29. The Court's ruling in *Zadvydas* is rooted in due process's requirement that there be "adequate procedural protections" to ensure that the government's asserted justification for a noncitizen's physical confinement "outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* at 690 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). In the immigration context, the Supreme Court only recognizes two purposes for civil detention: preventing flight and mitigating the risks of danger to the community. *Zadvydas*, 533 U.S. at 690; *Demore*, 538 U.S. at 528. The government may not detain a noncitizen based on any other justification.

**<u>CLAIM FOR RELIEF</u>**

**COUNT ONE**

**Violation of Fourth Amendment Right to Due Process**

30. Mr. Jimenez re-alleges and incorporates by reference the paragraphs above.

31. The Supreme Court has recognized that in administrative removal proceedings, courts should suppress evidence in the case of "egregious violations of the Fourth Amendment or other liberties that transgress notions of fundamental fairness." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984). The "clearly established law" in the Ninth Circuit provides that during immigration proceedings, "evidence must be suppressed if it was obtained through an egregious violation of the Fourth Amendment." *Orhorhaghe v. INS*, 39 F.3d 488, 493 (9th Cir. 1994); *see also Sanchez v. Sessions,* 904 F.3d 643, 651 (9th Cir. 2017); *Lopez-Rodriguez v. Mukasey,* 536 F.3d 1012 (9th Cir. 2008).

32. Egregious violations occur when government agents have either engaged in "conduct a reasonable officer should have known would violate the Constitution" or "committed the violations deliberately." *Id.* at 493. Indeed, "all bad faith violations" of the Fourth Amendment "are considered sufficiently egregious to require application of the exclusionary sanction" in immigration proceedings. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1449 (9th Cir. 1994). Evidence obtained through egregious violations requires suppression regardless of the probative value of the evidence. *Orhorhaghe,* 38 F. 3d at 501-02; *Adamson v. Commissioner of Internal Revenue*, 745 F.2d 541, 545 (9th Cir. 1984). Here, ICE officers engaged in an egregious of violation of the Fourth Amendment.

33. The Fourth Amendment requires immigration agents to have reasonable suspicion

before seizing a non-citizen. *United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975); *Orhorhaghe*, 38 F.3d at 494. A seizure occurs when a "reasonable person . . . believe[s] that he [is] not free to leave" the presence of government agents. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), including when an officer merely indicate[s] by his authoritative manner that that the person is not free to leave." *United States v. Patino*, 649 F.2d 724, 727 (9th Cir. 1981). Moreover, where a search occurs on private property, as it did here, the Ninth Circuit has stated that this "militates strongly in favor of finding a seizure." *Orhorhaghe*, 38 F.3d at 495; *see also La Duke v. Nelson*, 762 F.2d 1318 1328-29 (1985) (establishing that a place of residence has the highest "measure of protection" under the Fourth Amendment).

34. Reasonable suspicion must provide a "rational basis for separating out the illegal aliens from American citizens and legal aliens." *Nicacio v. INS*, 797 F.2d 700, 704 (9th Cir. 1985). Reasonable suspicion requires "specific articulable facts." *Gonzalez-Rivera*, 22 F.3d at 1445. In *Gonzalez-Rivera*, for example, the Ninth Circuit held that no reasonable suspicion existed where the immigrant agent claimed that he stopped the immigrant based on his "failure to look at the Border Patrol car; the fact that he appeared to have a 'dry' mouth; the fact that he was blinking, and Gonzalez's Hispanic appearance." *Id.* at 1446.

35. Mr. Jimenez was clearly "seized" within the meaning of the Fourth Amendment because he was not free to leave or terminate the encounter with the ICE agents. Here, the officers, as part of a "Fugitive Operations Team," were engaged in a "targeted enforcement operation to locate and arrest VERDUGO Terrazaz, …… [redacted] [redacted] 678 at his last known location of 66455 Dillon Rd, Spc 39, Desert Hot Springs, CA 92240." *See* Exhibit B, I-213. Notably, the I-213 submitted by the government, consistent with Mr. Jimenez's declaration, correctly lists his residence as 66455 Dillon Rd, Spc 2, Desert Hot Springs, CA 92240. Mr.

Jimenez maintains in his sworn declaration that on May 13, 2026, he departed from his place of residence at Space 2 on Dillon Road. *See* Exhibit D. Mr. Jimenez asserts he has lived at Space 2 since June of 2022; that he has never lived or set foot in Space 39 and that he does not know anyone by the name of "Verdugo Terrazaz." *Id.*

36. The officers claimed that prior to detaining Mr. Jimenez, they observed him "exit the residence" and enter his truck. *See* Exhibit B. Accordingly, the "residence" that the officers would have seen Mr. Jimenez "exiting" would have been Space 2 and not Space 39. Thus, even assuming the officers had reasonable suspicion to detain "Verdugo Terrazaz" or an individual matching his physical appearance departing from Space 39, they most certainly did not have reasonable suspicion to detain Mr. Jimenez, let alone individuals residing at Space 2. The officers than, had no objective, articulable basis for the seizure of the Jimenez.

37. Although the Fourth Amendment tolerates objectively reasonable mistakes of fact or law when officers possess the requisite reasonable suspicion, this mistake-of-fact doctrine applies only when officers have made a *reasonable* error in identifying the correct target of their suspicion. *See e.g., Heien v. North Carolina,* 57 U.S. 54 (2014) (holding that the Fourth Amendment was not violated where an officer conducted a traffic stop based on the mistaken belief that a single brake light violated state law); *Illinois v. Rodrguez,* 497 U.S. 177 (1990) (holding that there is no fourth amendment violation where a police officer reasonably, but mistakenly believed that a third party had authority to consent to the warrantless search of the defendant's apartment); *Hill v. California,* 401 U.S. 797 (1970) (no fourth amendment violation where police mistakenly, but reasonably arrested a third party instead of the defendant *at the latter's residence* and seized multiple items of contraband incident to this arrest). However, the doctrine does not permit officers to substitute one person for another when they lack any

individualized suspicion regarding the person actually stopped.

38. The common thread in this line of cases described above is that the law enforcement officers acted "reasonably." With respect to the present case, the officers did not act reasonably. Indeed, they had information that the target of their investigation resided at Space 39, and despite this, they chose to detain Mr. Jimenez after witnessing him exit his residence at Space 2. *Cf. Hill,* U.S. at 799 (warrantless search of apartment did not violate fourth amendment where officers mistakenly arrested a third party whom they reasonably believed to be the defendant *and the mistaken arrest occurred at the defendant's apartment*). This was not reasonable and the facts in this case support the conclusion that the seizure was unlawful and violated the Fourth Amendment.

39. When government agents act deliberately to violate the Constitution, their actions are egregious. *See Adamson*, 745 F.2d at 545. As the Ninth Circuit has stated, "the government's *manner* of obtaining evidence can be so offensive to warrant suppression." *Orhorhaghe*, 38 F.3d at 502. (emphasis added). Physical violence can demonstrate the existence of an egregious violation, but the courts have "not impose[d] a *requirement* that a search or seizure involve physical brutality to warrant suppression." *See id.* (emphasis in original). In the present case, the evidence demonstrates that the ICE officers acted deliberately to violate the Constitution. As discussed above, the officers' investigation targeted an individual who resided at of "66455 Dillon Rd, Spc 39, Desert Hot Springs, CA 92240." They observed Mr. Jimenez "exit" his "residence" *at Space 2.*

40. A reasonable officer would not have pursued Mr. Jimenez for the obvious reason that the purported target of their investigation resided elsewhere. Thus, the subsequent detention and

arrest of Mr. Jimenez constituted a deliberate violation of the fourth amendment. The bald and unsupported statement in the I-213 that Jimenez resembled the target of their investigation does nothing to alter this conclusion, as there are no other additional facts provided. Thus, we have no basis to evaluate whether this was a reasonable justification mistaking Mr. Jimenez for their target. And an individual's ethnic appearance cannot alone furnish the requisite reasonable suspicion that the individual is in the country illegally. *See Brignoni-Ponce*, 422 U.S. at 885-86.

41. The deliberate way in which the officers violated the Constitution was further manifest in the *manner* in which they detained Mr. Jimenez. *See Orhorhaghe*, 38 F.3d at 502. (emphasis added). The officers' conduct went far beyond the brief detention for investigatory purposes that reasonable suspicion authorizes. Indeed, multiple masked and armed officers all converged on Mr. Jimenez's location, screaming at him, with one officer pounding on Mr. Jimenez's passenger side window with an unknown object. *See* Exhibit D. This officer "screamed at the top of his lungs" from one side of Mr. Jimenez's vehicle, while Mr. Jimenez attempted to converse with another officer near his window. *See id.* The officer at the driver's side, nearest to Mr. Jimenez, opened his vehicle door without his consent and placed his foot inside the vehicle as he spoke to Mr. Jimenez. The same officer ultimately grabbed Mr. Jimenez by his left arm and forcibly removed Mr. Jimenez from his truck without giving him the opportunity exit his vehicle voluntarily. *Id.*

42. This conduct on the part of the officers who detained and arrested Mr. Jimenez further demonstrates that they deliberately violated the Constitution. Therefore, this Court should find that the ICE agents' actions constituted an egregious violation of the Fourth Amendment.

## COUNT TWO

### Violation of Fifth Amendment Right to Due Process

43. Mr. Jimenez re-alleges and incorporates by reference the paragraphs above.

44. The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. amend. V.

45. In addition to the Fourth Amendment violations, the ICE agents also engaged in violations of the Fifth Amendment which warrant suppression of the evidence. Where ICE officials engage in coercive tactics that cause individuals to make statements involuntarily, allowing such statements to serve as the basis for a removal hearing would be fundamentally unfair. *See Bong Youn Choy v. Barber*, 279 F.2d 642, 646-47 (9th Cir. 1960); *Matter of Garcia*, 17 I&N Dec. 319, 321 (BIA 1980).

46. Involuntary statements include those made where government agents engaged in coercion, duress, threats, or interfered with an individual's attempt to exercise their rights. *See Matter of Ramirez-Sanchez,* 17 I& N Dec. 503, 506 (1980); *see also Matter of Garcia,* 17 I&N Dec. at 321 (suppressing statement involuntarily made after respondent was denied right to contact attorney). In *Bong Youn Choy*, the Ninth Circuit noted that the petitioning non-citizen made a statement when he was in a "sleepless," and "distressed" state, and "sought to appease his official accusers by making the statement containing admissions." 279 F.2d at 647. The Court suppressed the statement because "the improper conduct of the immigration agents induced the admissions." *Id. See also Matter of Toro,* 17 I&N Dec. 340, 343 (BIA 1980) (recognizing that "cases may arise in which the manner of seizing evidence is so egregious that to rely on it would offend the Fifth Amendment's due process requirement of fundamental fairness.").

47. The abusive and coercive tactics used by ICE agents in this case rendered it impossible for Mr. Jimenez to make voluntary statements to the officers. Unfortunately for Mr. Jimenez, the egregiousness on the part of ICE continued after his arrest. As detailed in his declaration (Exhibit D), the officers who arrested Mr. Jimenez then drove him to a nearby parking lot and placed in him in a van with several other arrestees. Mr. Jimenez asserts that the van had no working seat belts and that he was forced to remain handcuffed for the entire duration of the ride to San Bernardino. Mr. Jimenez describes this experience as "incredibly scary." *See* Exhibit D. Upon his arrival at the San Bernardino facility, Mr. Jimenez was forced to remain overnight in a "freezing" room where no seating was available, thus leaving Mr. Jimenez with no choice but to attempt to sleep on the cold floor. *Id.* Mr. Jimenez describes this experience as "agonizing" and a "horrible and terrible experience." *Id.* ICE's actions offend the Fifth Amendment's guarantee of fundamental fairness, and Mr. Jimenez did not make any statements to governmental agents voluntarily. Accordingly, any statements made to ICE agents during the course of the unlawful seizure or to agents who interrogated Mr. Jimenez both during the course of his arrest and later at the San Bernardino temporary holding facility should have been suppressed by the Immigration Judge under the Fifth Amendment.

## COUNT THREE

### Regulatory Violations

48. Mr. Jimenez re-alleges and incorporates by reference the paragraphs above.

49. 8 C.F.R. §§ 287.5(1) prohibits an immigration agent from questioning an individual if they do not have a warrant unless the person is "believed to be an alien." *See also* INA §287(a)(1). Thus, before ICE agents approached and seized Mr. Jimenez, DHS regulations required them to have a reason to believe Mr. Jimenez was an alien. However, the ICE agents

had no reason to believe he was "an alien," before they detained him. Accordingly, the ICE agents violated § 287.5(1).

50. 8 C.F.R. 287.8(b) further restricts an ICE agent's authority to detain persons for additional questioning unless the officers have "reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States." Unless they have reasonable suspicion, ICE agents may not "restrain the freedom of an individual, not under arrest, to walk away." 8 C.F.R. 287.8(b) (1). As discussed above, here the ICE agents effectuated a seizure of Mr. Jimenez without reasonable suspicion.

51. 8 C.F.R. § 287.8(c)(vii) provides, "[t]he use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement *is prohibited*." (emphasis added). As discussed above, the ICE agents subjected Mr. Jimenez to coercion and abuse, thereby violating their own agency regulations.

## COUNT FOUR

## Fifth Amendment Due Process Violation Related to the Immigration Judge's Denial of Bond

52. Mr. Jimenez re-alleges and incorporates by reference the paragraphs above.

53. An Immigration Judge's determination regarding whether a non-citizen poses a danger to the community or a flight risk is reviewed for an abuse of discretion. *See Martinez v. Clark*, 124 F.4th 775, 784 (9th Cir. 2024) ("When questions require a close review of agency-found facts, like the 'dangerousness' determination, we review for an abuse of discretion."); *Vasquez* (A# XXX-XX7-182*) v. Warden, Cal. City Immigration Processing Ctr.*, Case No. 1:26-cv-04482 DJC SCR, 2026 U.S. Dist. LEXIS 205967, 2026 WL 2676859, at *3 (E.D. Cal. Sept. 11, 2026); Poot, 2026 U.S. Dist. LEXIS 203946, 2026 WL 2659590, at *6 ("An IJ's determination that a detainee poses

a danger to the community or a flight risk is a mixed question of law and fact that may be reviewed for abuse of discretion.") (citing *Martinez, 124 F.4th at 783*). "Under abuse of discretion review, the Court 'cannot reweigh evidence,' but instead determines whether the immigration 'applied the correct legal standard.'" *Poot,* 2026 U.S. Dist. LEXIS 203946, 2026 WL 2659590, at *6 (quoting *Martinez*, 124 F.4th at 785).

54. Under the Board of Immigration Appeals' decision in *Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006), factors relevant for determining bond eligibility are: (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

55. Here, the Immigration Judge abused his discretion in denying Mr. Jimenez's request for bond on the basis that he was a danger to the community and a flight risk. To support his determination regarding danger, the Immigration Judge relied on Mr. Jimenez's 2005 misdemeanor convictions driving under the influence and hit and run, and a second conviction for driving under the influence in 2022 (the arrest of which occurred in 2021). *See* Exhibits G, H and I. With respect to flight risk, the Immigration Judge focused on the fact that Mr. Jimenez failed to appear for a hearing related to a driving on a suspended license charge in 2006, where a warrant was issued. Further, the Immigration Judge characterized Mr. Jimenez's prospects for relief as "speculative." *See* Exhibit I.

56. The Immigration Judge's danger finding cannot be sustained, where Mr. Jimenez's first DUI occurred in 2006, approximately 20 years ago. Moreover, the Immigration Judge abused his discretion in his analysis of the second DUI conviction where he ignored evidence showing that Mr. Jimenez successfully enrolled in and completed a 36-month alcohol program in connection with this case and attended alcoholics anonymous classes as well. *See* Exhibit G at p. 39 (Case Summary, reflecting completion of "Impaired Driver Program"). Rather than grapple with this mitigating evidence, the Immigration Judge relied on a two BIA cases where the Board had denied bond to non-citizens charged with or convicted of DUI offenses. However, the facts in the cited cases are materially distinguishable from Mr. Jimenez's case. In *Matter of Choc-Tut*, 29 I&N Dec. 48, 50 (BIA 2025), the Board reversed the Immigration Judge's decision granting bond where the non-citizen had multiple pending criminal charges at the time of his bond hearing, including having no driver's license or insurance after being involved in an accident, driving without a license and careless driving, a subsequent arrest for careless driving, driving under the influence of alcohol, having an open alcohol beverage container in a motor vehicle, and driving without a driver's license. At the time of this arrest, he had a blood alcohol content of .214. All of these charges were pending against the non-citizen at the time of his bond hearing. This case is distinguishable from the instant one because as noted previously, Mr. Jimenez's first DUI offense occurred 20-years ago. In addition, Mr. Jimenez presented evidence of rehabilitation as evidenced by the court record documenting his completion of a three-month alcohol program and participation alcoholics anonymous classes – evidence which the Immigration Judge ignored. *See* Exhibit G.

57. *Matter of Siniauskas*, 27 I&N Dec. 207, 209 (BIA 2018) – the other BIA case cited by the Immigration Judge – is also distinguishable. Thus, in *Siniauskas,* the Board reversed the Immigration Judge's bond grant and held that the non-citizen was a danger to the community where the record showed that he had three previous convictions for driving under the influence and fourth

charge pending. Further, two of the convictions, as well as the pending charge involved accidents. Here, this case bears no resemblance to the instant one because one of Mr. Jimenez's DUI's occurred 20-years ago and his second one was offset by mitigating evidence showing rehabilitation. "Here, the Immigration Judge improperly relied on blanket statements from *Choc-Tut* and *Siniauskas* without considering or discussing any distinguishable facts underlying Petitioner's single arrest for driving under the influence." *See Zhamagortsyan v. Warden, Adelanto ICE Processing Ctr.*, No. 5:26-cv-04093-DTB, 2026 U.S. Dist. LEXIS 217699, 2026 WL 2876062 at *7 (C.D. Cal. September 24, 2026).

58. The Immigration Judge's determination regarding flight risk was also an abuse of discretion where he made conclusionary statements regarding Mr. Jimenez's prospects for immigration relief and relied on Mr. Jimenez's failure to appear for criminal court hearing back in April of 2006 (Exhibit H at – over 20-years ago. *See* Exhibit I. Mr. Jimenez's failure to appear for a hearing in 2006 has no bearing on whether he poses a flight risk today, in 2026. With respect to relief being "speculative," the Immigration Judge failed to explain *why* he believed Mr. Jimenez's prospects for relief were speculative. *See Garcia v. Hernandez,* No. 2:26-cv-01432-TLF, 2026 U.S. Dist. LEXIS, 2026 WL 1724216 at *6 (W.D. Wash. June 15, 2026).

59. Accordingly, the Immigration Judge's decision denying bond on the basis of danger to the community and flight risk constituted an abuse of discretion and violation of Mr. Jimenez's rights under the Due Process Clause of the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Declare that Petitioner's ongoing detention violates the Fourth Amendment and Due Process Clause of the Fifth Amendment and 8 U.S.C. § 1231(a);

(3) Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately;

(4) Award Petitioner attorney's fees and costs under the Equal Access to Justice Act, and on any other basis justified under law; and

(5) Grant any further relief this Court deems just and proper.

Dated: October 21, 2026

Los Angeles, California

Respectfully submitted,

/s/ Aaron M. Morrison

Aaron M. Morrison
Law Office of Aaron M. Morrison
2000 Riverside Drive
Los Angeles, CA 90039
213 640-9129
aaronmorrisonlaw@gmail.com
*Counsel for Petitioner*

**VERIFICATION BY SOMEONE ACTING ON PETITIONER'S BEHALF PURSUANT TO 28 U.S.C. § 2242**

I am submitting this verification on behalf of the Petitioner because I am the Petitioner's attorney. I have discussed with the Petitioner the events described in this Petition. On the basis of those discussions, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Signature: /s/ Aaron Morrison

## List of Exhibits


| | |
|---|---|
| Notice to Appear | A |
| Form I-213 | B |
| FBI Record | C |
| Motion To Suppress | D |
| DHS Opposition To Motion To Suppress | E |
| Decision of the Immigration Denying Motion To Suppress | F |
| Petitioner's Bond Submission | G |
| DHS Bond Submission | H |
| Immigration Judge's Bond Order | I |
| Appeal Receipt from the Board of Immigration Appeals | J |